UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-20233-CIV-HUCK/SIMONTON

ABE ANGULO, and all others similarly
situated,

      Plaintiff,

v.

KEY TRANSPORTATION SERVICE CORP.,
a Florida corporation, and ORLIE JEDWAB, an
individual,

      Defendants.

_____/

NI~~~ ~~~
FIL~~

MAY 3 0 2006

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO ALL COUNTS ON THE ISSUES OF WHETHER HE WAS AN EXEMPT EMPLOYEE UNDER THE MOTOR CARRIER EXEMPTION, THE TAXICAB EXEMPTION, OR § 207(i), WHETHER HE WAS AN EMPLOYEE, WHETHER HE WORKED OVERTIME, AND WHETHER THE DEFENDANTS VIOLATED THE RECORDKEEPING PROVISIONS OF THE FLSA, WITH INCORPORATED MEMO OF LAW**

Plaintiff, Abe Angulo ("Angulo"), files this Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c). An indexed Statement of Undisputed Material Facts (cited hereinafter as "Facts ¶ ___") is incorporated herein, along with a supporting Memorandum of Law. The documents and deposition testimony referred to in the indexed Statement of Undisputed Material Facts are attached thereto for convenience of reference.

## BACKGROUND

This is a wage and hour case brought under the Fair Labor Standards Act (29 U.S.C. § 201 *et seq.* The Defendants are a local limousine company and its owner, and Angulo was a limousine driver for them. Angulo worked overtime, but was not paid time and one-half for it, as required by the FLSA. (*Second Aff. of Angulo* ¶ 2, 9). The Defendants' are taking the position that even if Angulo was an employee, he was exempt under the Motor Carrier Act exemption stated in 29 U.S.C. § 213(b)(1), the taxicab exemption 29 U.S.C. § 213(b)(17), and the Defendants appear to deny that they violated the recordkeeping provisions of the FLSA. Because Angulo can show that he is entitled to summary judgment concerning the motor carrier exemption, the taxicab exemption, whether he worked overtime, whether he was an employee, and whether the Defendants violated the recordkeeping provisions of the FLSA, Angulo files this instant Motion.

In sum, Angulo cannot be exempt under the motor carrier exemption since he did not drive across state lines (Facts ¶ 1), because the Motor Carrier Act makes clear that it only applies to the extent that

"passengers, property, or both, are transported by a motor carrier—(1) between a place in—(A) a State and a place in another state; (B) a State and another place in the same State through another State; . . . ." 49 U.S.C. § 13501. Additionally, the Motor Carrier Act only applies to vehicles that weigh more than 10,000 lbs., and the vehicles Angulo drove for the Defendant weighed less than that. (*Second Aff. of Angulo* ¶ 6). The Court should also note that the Department of Labor recently (within the past few months) investigated the Defendants, and determined that the motor carrier exemption does not apply (Facts ¶¶ 4-5), and three recent opinions from Judges Seitz, Ungaro-Benages, and Hoeveler hold that the exemption is not applicable to limousine drivers in South Florida who make only local trips and do not drive out of state. (Facts ¶ 7). In addition, if the Court disregards the plain meaning of the Motor Carrier Act, and finds that Angulo could be subject to the Act if he drove in "interstate commerce", Angulo is entitled to summary judgment as to this issue, because: 1) under the applicable law (including a binding former Fifth Circuit decision and a Department of Labor regulation), Angulo did not drive in interstate commerce because he never crossed state lines, and as held by Judges Seitz and Ungaro-Benages, the Defendants do not have a contract with an air carrier to provide for through-ticketing, and because they do not, two administrative decisions by the ICC and the STB, which are entitled to *Chevron* deference because the agencies implementing the Motor Carrier Act defined the scope of their authority, require the conclusion that the exemption is inapplicable.

Concerning the taxicab exemption, the Department of Labor also found that that exemption does not apply. Moreover, the Defendants are not licensed to provide taxicab transportation, do not currently own or lease a taxicab, they have testified under oath and issued rules and regulations that state that they are not a taxicab company, and Angulo never drove a taxicab for them while he was employed there. (Facts ¶¶ 8-22). The Defendants' attempt to have the Court declare a limousine driver to be a taxicab driver in order to hold that Angulo is an exempt employee, is contrary to the well-settled legal rubric that all exemptions under the FLSA be construed narrowly against the employer, as recognized by numerous cases (including the recent Judge Seitz opinion) and a Department of Labor Opinion Letter.

Concerning whether Angulo can prove that he worked overtime in any one workweek, the Defendants' cannot rebut Angulo's testimony that he worked overtime. (*Second Aff. of Angulo* ¶ 2, 9).

Concerning whether Angulo was an employee, Angulo is entitled to summary judgment as to this issue, because, one of the Defendants' management employees (Janik Carulla) who used to be a driver testified, after a lengthy discussion of the all of the factors to the economic realities test, that as a matter of economic reality the drivers are dependent upon the Defendants to earn their livelihood. (Facts ¶ 26). Additionally, the Defendants had Angulo fill out an "Application for Employment" (Facts ¶ 24), and the various factors under the economic realities test show that the drivers are clearly employees. (Facts ¶ 28). Additionally, the DOL recently found that the drivers are employees. (Facts ¶ 27).

Angulo's is entitled to summary judgment as to the issue of whether the Defendants violated the record-keeping requirements of the FLSA and whether § 207(i) applies, because: 1) the Defendants did not keep his records concerning the hours that he worked, and 2) the Department of Labor investigated the Defendants with respect to several employees (including one limousine driver) and found that the Defendants violated this record-keeping provision of the Act, and no commission was paid. (Facts ¶¶ 30-34).

## MEMORANDUM OF LAW

### I.   THE LEGAL STANDARD FOR GRANTING A MOTION FOR SUMMARY JUDGMENT

Summary judgment may be granted when evidence in the record establishes there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the burden of production. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). When the burden has been met by the moving party, "the burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The Defendants "'must present affirmative evidence in order to defeat a properly supported motion for summary judgment' to show that there is a genuine issue for trial." *Tidmore Oil Co. v. BP Oil Co./Gulf Prods. Div.*, 932 F.2d 1384, 1387 (11th Cir. 1991). Put another way, the non-moving party must advance "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The "mere existence of a scintilla of evidence in support of [the non-moving party's] position will be insufficient. . . ." *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

### II.   EXEMPTIONS UNDER THE FAIR LABOR STANDARDS ACT ARE TO BE NARROWLY CONSTRUED AGAINST THE EMPLOYER

The FLSA is remedial in nature, and is to be broadly construed. *Antenor v. D & S Farms*, 88 F.3d 925 (11th Cir. 1996). A corollary to this well-settled rubric is that "[e]xemptions under the FLSA are to be construed narrowly against the employer who asserts them. The employer has the burden of showing that it is entitled to the exemption." *Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). Particularly, "[w]hen a motor carrier relies on the motor carrier exemption to defeat employees' claims for overtime compensation, the exemption is construed narrowly against the carrier" *Williams v. Alex's Transportation, Inc.*, 969 F. Supp. 1142, 1144 (N.D. Ill. 1997), and the employer has the burden of proving "plainly and unmistakably" that the drivers qualify for the motor carrier exemption. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). The Supreme Court has explained that because the FLSA is a remedial statute, it must be interpreted broadly; the Court wrote:

> [The FLSA is] remedial and humanitarian in purpose. We are not here dealing with mere chattels or articles of trade but with the rights of those who toil. . . . Those are rights that

Congress has specifically legislated to protect. Such a statute must not be interpreted or applied in a narrow, grudging manner.

*Tennessee Coal, Iron & Ry. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944).

### III. ANGULO IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE AS TO WHETHER THE MOTOR CARRIER ACT EXEMPTION IS APPLICABLE

#### A. The Plain Language of the Motor Carrier Act Makes Clear that It Does Not Apply to Angulo, Because He Never Drove a Customer Out of State

The Motor Carrier Act makes clear that it only applies to the extent that "passengers, property, or both, are transported by a motor carrier—(1) between a place in—(A) a State and a place in another state; (B) a State and another place in the same State through another State; . . . ." 49 U.S.C. § 13501. Angulo cannot be exempt under the motor carrier exemption since he did not drive across state lines. (Facts ¶ 1). Angulo never drove a passenger out of the State of Florida, whether to a final out-of-state destination point for the passenger, or to arrive at a final destination point in the State of Florida by going outside the State of Florida to get there. Accordingly, summary judgment should be granted in Angulo's favor.

In interpreting a statute, the courts should begin "with the language of the statute itself." *United States v. Ron Pair Enterprises*, 489 U.S. 235, 241 (1989). "[T]he plain meaning of the statute controls unless the language is ambiguous or leads to absurd results." *United States v. McLymont*, 45 F.3d 400, 401 (11th Cir. 1995). And, as the Supreme Court has recently reminded, the best evidence of a statute's meaning is the text itself. *Geier v. American Honda Motor Co.*, 120 S. Ct. 1913, 1932 (2000). When "the intent of Congress is clear, that is the end of the matter." *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842 (1984).

In this case, it is clear that a plain reading of the text ends all argument concerning whether the Motor Carrier Act applies to Angulo. The statute makes clear that it only applies in instances in which the driver drives out of state (whether to a destination there, or to arrive at an in-state destination by going out of state). 49 U.S.C. § 13501. Since Angulo did neither (Facts ¶ 1), he is entitled to summary judgment. The Court should note that the statute (as quoted above) is not ambiguous, and it does not mention anything about a driver being covered by the Act who merely drives in "interstate commerce".

A recent concurring opinion in a Third Circuit case acknowledges the result urged by Angulo here. In *Packard v. Pittsburgh Trans. Co.*, 418 F.3d 246, 259 (3d Cir. 2005) (J., Nygaard, concurring), Judge Nygaard noted that the Motor Carrier Act only gives the Secretary of Transportation authority over drivers of a motor carrier who drive out of state (whether to a destination there, or to arrive at an in-state destination by going out of state). Angulo requests that the Court follow Judge Nygaard's concurrence, and hold that the Motor Carrier Act does not apply to Angulo, because he never drove outside of the State of Florida.

4

Judge Nygaard noted that to the extent that other circuit courts of appeal have explored the scope of the Motor Carrier Act exemption via inquiry into the presence or absence of "interstate commerce", those cases mistakenly did so based on *Walling v. Jacksonville Paper Co.*, 317 U.S. 564 (1943), because *Walling* (not a Motor Carrier Act case) simply held that purely intrastate acts may constitute interstate commerce within the meaning of *individual coverage*[1] under the Fair Labor Standards Act if the intrastate acts are part of a "practical continuity of movement" between the states. *Packard*, 418 F.3d at 260 (citing *Walling*, 317 U.S. at 568). The contours of interstate commerce under the Motor Carrier Act and the Fair Labor Standards Act are different. 29 C.F.R. § 782.7(a). Accordingly, *Walling* has no bearing on the scope of the Motor Carrier Act exemption. *Packard*, 418 F.3d at 260.

Binding authority appears to have already stood for the proposition that Judge Nygaard espouses. The regulations promulgated by the Department of Labor, 29 C.F.R. § 782.7 (2000), state that "[e]ngagement in local transportation which is entirely intrastate commerce provides no basis for exempting a motor carrier employee." Judge Hoeveler relied on a binding former Fifth Circuit case, which was relied on in the adoption of § 782.7, to specifically hold that "[e]ven if the goods or people originated outside the state, if the motor carrier does not drive their vehicles across state lines, then they are not involved in interstate commerce" and thus the Motor Carrier Act exemption is not applicable. *Lieberman, et al. v. Corporate Connection Lines, Inc.*, at p. 4, Case No. 03-22814-CIV-HOEVELER (Apr. 20, 2005) (citing *Kline v. Wirtz*, 373 F.2d 281, 282 (5th Cir. 1967)). In short, Angulo is not exempt, because he never drove interstate. (*Angulo Affidavit* ¶ 4). *Kline* and 29 C.F.R. § 782.7 require the conclusion that Angulo's Motion should be granted.

Finally, the Department of Labor's Field Operations Handbook specifically holds that the Motor Carr

**B.     The Weight Requirements Associated with the Motor Carrier Act also Require the Conclusion that the Motor Carrier Act Exemption Does Not Apply**

Angulo drove minivans and sedans (Lincoln Town Cars) for the Defendants. These vehicles weigh less than 10,000 lbs., (*Second Aff. of Angulo* ¶ 6), and no more than 3 passengers can ride in them. The Court should

---

[1] In cases arising under the FLSA, there are two possible ways in which an employee may demonstrate that the employer is covered under the Act: 1) traditional coverage (typically referred to as individual coverage), and 2) enterprise liability. The two ways of invoking the FLSA, are completely different.

Traditional individual coverage is applicable: 1) to an employee engaged in commerce or 2) to an employee engaged in the production of goods for commerce. *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 295 n.8 (1985). The FLSA defines the term "commerce" as meaning "trade, commerce, transportation, transmission or communication among the several states . . . ." 29 U.S.C. § 203(b).

Concerning enterprise coverage, Congress has legislated that employees of *enterprises* that have a gross annual sales volume of over $500,000.00 are covered by the FLSA if such employees merely handle goods that "have been moved in or produced for commerce." 29 U.S.C. § 203(s)(1)(A)(i).

note that the Motor Carrier Act has recently been amended. The amended statute, specifically 49 U.S.C. § 13102(14), reads "The term 'Motor Carrier' means a person providing commercial motor vehicle (as defined in section 31132 [49 U.S.C. § 31132]) transportation for compensation." The portion in parenthesis was added by the amendment. The newly incorporated section 31132(1) defines the term "motor vehicle" for purposes of the statute as follows:

> In this subchapter—
>
> (1) 'commercial motor vehicle means a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, in the vehicle—
> (A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater;
>
> (B) is designed or used to transport more than 8 passengers (including the driver for compensation);
>
> (C) is designed or used to transport more than 8 passengers, including the driver, and is not used to transport passengers for compensation; or
>
> (D) is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103../uscode49/usc sec 49 00005103----000-.html of this title and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103../uscode49/usc sec 49 00005103----000-.html.

49 U.S.C. § 31132(1). Thus, under the amendment, those motor carriers whose qualifications and maximum hours of service the Secretary may regulate is limited to those who provide transportation only in those vehicles described in § 31132(1). The pre-amendment language did not contain this limitation. In sum, the amended section on its face limits those over whom the Secretary has regulatory power to motor carriers using vehicles as defined in § 31132(1) which in turn limits those who are exempt from FLSA coverage.

To see if there was any indication that there was no intention to so limit the Secretary's power, undersigned counsel looked at all of the amendment's changes in definitions in section 13102. Undersigned counsel found no basis in these other changes to indicate that section 13102 should be interpreted in any way other than what it says on its face by virtue of the added language.

In six places the amendment added a full statutory citation in brackets after the section number referred to in the definition. This changed nothing in the meaning of those definitions.[2] In four places the amendment added the parenthetical term "as defined in" followed by a section number in brackets. In addition to section 14 this occurs in section 15 which also applies § 31132(1) to limit the definition of motor vehicle private to the same definition as that of motor vehicle. The amendment applies the same parenthetical

---

[2] The citations are added in the introductory language of § 13102, in sections 4(A) and (B) dealing with contract carriage, in two places in section 8(C) dealing with freight forwarders in section 17 dealing with noncontiguous domestic trade.

term in sections 6(B) and 7(B) to limit the definition of motor vehicle as it relates to a foreign motor carrier foreign motor carrier to the term motor vehicle as defined in § 31132(1).

The amended section also adds new sections 12 and 13 which respectively define "household goods motor carrier" and "individual shipper". These additions shed no light on Congress' intention by adding the language to section 13102(14).

Thus, looking at the amendments to § 13102 in their entirety gives no basis for any conclusion other than that the power of the Secretary to regulate qualifications and maximum hours of employment is limited to motor carriers as defined § 31132(1). It follows that those who do not fall within that definition are not exempt from the operation of the Motor Carrier exemption to the FLSA. In this case, according to internet research, the Lincoln Town Car sedans driven by the drivers weigh under 4,000 lbs. Moreover, those vehicles as argued by the Defendants in the *Rossi* case when they asserted the taxicab exemption, do not transport 8 or more passengers, but rather far fewer (no more than 3). Therefore, even if the drivers were driving across state lines (which they were not), the amendment to the Motor Carrier Act excludes the drivers, because the Secretary does not have power over the vehicles utilized by the Defendants' drivers.

C.   **There are a Former Fifth Circuit Case, a Department of Labor Regulation, and Administrative Opinions Which Are Entitled to *Chevron* Deference, Which Further Support Angulo's Position**

If the Court does not accept Judge Nygaard's concurrence, and does not accept the plain language of the statute with the weight restrictions, there is further authority, some of it binding, and some of it entitled to deference, that supports Angulo's position that the a through-ticketing contract or arrangement must be in place directly between the motor carrier (Defendants) and an *air carrier*, and that the passenger must pay the air carrier for both the cost of the airfare and the ground transportation in one ticket; this is known as a through-ticketing or common arrangement. *Powell, et al. v. Carey Int'l, Inc., et al.*, Case No. 05-21395-CIV-SEITZ (Mar. 17, 2006); *Cartun v. Carey Int'l, Inc., et al.*, Case No. 04-21074-CIV-UNGARO-BENAGES (Dec. 10, 2004); *Garcia v. Carey Int'l, Inc., et al.*, Case No. 03-22963-CIV-UNGARO-BENAGES (Dec. 10, 2004); *James T. Kimball-Petition for Declaratory Order*, 131 M.C.C. 908, 918 (1980); and *Motor Transportation of Passengers Incidental to Air*, 95 M.C.C. 526, 536 (1964).

Moreover, even if the Defendants had a "through ticket" or "common arrangement" with an air carrier (and they do not, see Facts ¶ 3), Angulo would not be exempt in any event. The fact that the motor carrier exemption of the FLSA only applies to motor carrier employees who truly travel between states is reiterated again and again throughout the Department of Labor's regulations. For example, returning to 29 C.F.R. § 782.3, in addition to defining the term "drivers" as only including those employees who drive between states, the regulation makes clear that people who drive for carriers purely within one state are not eligible for the "motor carrier exemption" to the FLSA:

> "[S]uch drivers to whom [the Secretary of Transportation's] regulatory power extends are, accordingly, employees exempted from the overtime requirements of the Fair Labor Standards Act by section 13(b)(1). This does not mean that an employee of a carrier who drives a motor vehicle is exempted as a "driver" by virtue of that fact alone. *He is not exempt if his job never involves transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act.*" 782.3 (citing *Southland Gasoline Co. v Bayley,* 319 U.S. 44; *Levinson v. Spector Motor Service,* 330 U.S. 649).

29 C.F.R. § 782.3 (emphasis added).   Further, the Department of Labor's Field Operations Handbook specifically states that the DOL's jurisdiction over private carriers is limited to the carriage of property, not persons see § 24a05 (attached hereto), and the transportation Defendants provides is for people.

Although the above-detailed DOL and DOT regulations clearly show that the 29 U.S.C. § 213(b)(1) exemption is only available to motor carriers that travel between different states, the defendants may argue that the § 213(b)(1) exemption can be available to a purely local carrier under a "continuity of movement" theory. The "practical continuity of movement" theory is that even a motor carrier's purely local, *intrastate* trip can sometimes be considered part of the continuous "interstate" movement of commerce if the trip was part of a leg of a larger, truly interstate trip, and thus the Secretary of Transportation's jurisdiction extends to that local carrier and the carrier is entitled to the § 213(b)(1) exemption, but this continuity of movement argument was rejected by *Kline v. Wirtz,* 373 F.2d 281 (5th Cir. 1967), which is binding.   Moreover, as stated above in § III.A., this theory need not be analyzed by the Court if it interprets the plain meaning of the Motor Carrier Act to require the actual crossing of state lines before it can apply to a driver.

If the Court does not accept the argument in § III.A above, or the *Kline* case, the "continuity of movement" theory is not applicable in any event, because it is not applied to the transportation of passengers (rather than goods), and is in direct contradiction to Department of Labor regulations:

> Where, however, it has been authoritatively held that transportation of a particular character within a single State is not in interstate commerce as defined in the Motor Carrier Act . . . *there is no basis for an exemption under section 13(b)(1), even though the facts may establish a "practical continuity of movement" from out-of-State sources* through such in-State trip so as to make the trip one in interstate commerce under the Fair Labor Standards Act. Of course, *engagement in local transportation which is entirely in intrastate commerce provides no basis for exempting a motor carrier employee.*

29 C.F.R. § 782.7 (citing to *Kline v. Wirtz,* 373 F.2d 281 (5th Cir. 1967)) (emphasis added).   The combination of this regulation and the holding in *Kline* end any discussion that the Motor Carrier Act applies.   *Lieberman, et al. v. Corporate Connection Lines, Inc.,* Case No. 03-22814-CIV-HOEVELER (Apr. 20, 2005).

In the last year or so, three Federal Judges from the Southern District of Florida have rejected the Defendants' arguments, and held that limousine drivers are not exempt from overtime under the Motor Carrier Act exemption.   *Powell, et al. v. Carey Int'l, Inc., et al.,* Case No. 05-21395-CIV-SEITZ (Mar. 17, 2006); *Cartun v. Carey Int'l, Inc., et al.,* Case No. 04-21074-CIV-UNGARO-BENAGES (Dec. 10, 2004);

*Garcia v. Carey Int'l, Inc., et al.*, Case No. 03-22963-CIV-UNGARO-BENAGES (Dec. 10, 2004); *Lieberman, et al. v. Corporate Connection Lines, Inc.*, Case No. 03-22814-CIV-HOEVELER (Apr. 20, 2005). The opinions of Seitz and Ungaro-Benages held that two administrative opinions are binding on them, because those opinions show an agency interpreting the scope of its own jurisdiction, and those opinions clearly hold that precisely the type of "arrangement" that the Defendants claim that they have with travel agencies and destination management companies (see Facts ¶ 3), are not sufficient to constitute a through-ticketing arrangement, and therefore drivers driving for such companies are not exempt under the Motor Carrier Act exemption.

Therefore, even if the Court were to follow the District Court opinions that hold if a ground transportation company has a through-ticketing or common arrangement with an air carrier, and if the drivers actually drove a passenger under such scheme (which they did *not* in this case) such drivers are exempt, the drivers are not exempt in this case, because in this case the Defendants did not have a through-ticketing or common arrangement with an air carrier, but rather simply do business with travel agencies and destination management companies.   (Facts ¶ 3).  Two administrative opinions are binding on this issue.  In *Motor Transportation of Passengers Incidental to Air*, 95 M.C.C. 526, 536 (1964), the I.C.C. said that where there has been a prior or subsequent interstate air movement (as opposed to an intrastate air movement) the motor transportation of passengers between "an airport and another point in the same state is an interstate movement if there is a through ticketing or common arrangement *between the motor carrier and the air carrier* for continuous passenger interchange." (emphasis added).

The Interstate Commerce Commission addressed this specific issue in *James T. Kimball-Petition for Declaratory Order*, 131 M.C.C. 908, 918 (1980), which held:

> . . . the motor transportation wholly within a single State of passengers or groups of passengers, between an airport and another point in the same state, either prior to or subsequent to an interstate air movement from or to the airport (1) is an intrastate movement where there is no continuous passage or interchange, and (2) is an interstate movement where there is an arrangement [referred to as a "common arrangement" or "through ticketing"] *between the motor carrier and the air carrier for continuous passage or interchange.   There being no such arrangement in Petitioner's operations, we conclude that they are in intrastate, not interstate commerce.*

*Kimball*, 131 M.C.C. at 918 (emphasis added).  The *Kimball* case is instructive here, in part because of its factual similarities to the case at bar.  In *Kimball*, Kimball's motor carrier operation was conducted as part of a package tour originating at points outside of Florida and involving air transportation to Florida, motor carrier transportation from the hotel to the airport of departure, and air transportation out of Florida. *Kimball's* motor carrier operation was conducted pursuant to the contracts and agreements entered into with the travel and tour agency located outside of Florida.  The travel and tour agency sold to its customers complete one-price package tours providing for, among other things, air transportation to Florida, motor carrier transportation from the airport of arrival to the hotel, motor carrier transportation from the hotel to the

airport of departure, and air transportation out of Florida. *Kimball* billed the travel and tour agency and not the passengers for the round-trip local ground transportation which Petitioner performs. *Kimball's* argument was that the above factual circumstances were a sufficient "common arrangement" to bring his operations within the "through ticketing" or common arrangement concept.

The I.C.C. did not agree. The Commission stated, "the 'common arrangement' or through ticketing referred to in these cases is an arrangement *between the motor carrier and the air carrier.* Kimball has no such arrangement with any air carrier. His only arrangement is with his travel and tour agency." In this case, the Defendants do not state that they have a contract directly with an air carrier (or any other type of carrier), (*Orlie Jedwab Affidavit* ¶ 3), and admitted in *Rossi* that they did not have one. In fact, the Defendants admit that they do not have one, which renders their affirmative defense frivolous. Further support for this position taken by the administrative agency can be found in *Pennsylvania Public Utilities Commission v. United States,* 812 F.2d 8 (D.C. Cir. 1987), where the D.C. Circuit Court of Appeals stated with respect to through-ticketing:

> *Kimball* made clear that the term 'common arrangement' does not include a 'package tour' involving both air and ground transportation that was arranged by a third party (such as a travel agent). Instead, the Commission held that a 'common arrangement' exists only when there is 'an arrangement between the motor carrier and the air carrier.' . . . To qualify as a bona fide arrangement there must be either a through ticket or other through arrangement between the motor carrier and air carrier.

*Pennsylvania Public,* 812 F.2d at 11-12. The Interstate Commerce Commission echoed these sentiments in *San Juan Air Services, Inc.-Petition for Declaratory Order,* 1988 WL 225366 (I.C.C.), (a case in which San Juan Air, a motor carrier had *direct* contracts with airlines), noting that through-ticketing is dependent upon "common arrangements between the motor carrier and the air carrier for continuous passage or interchange." *San Juan Air,* *4 WL 225366.

The holding of these cases is that the common or through-ticketing arrangement *must* be between the actual air carrier and the ground carrier. However, when the arrangement is through a third party such as another corporation, a travel agent, convention company, or other intermediary, there is no true through-ticketing or "common arrangement". Although this exception does not apply because *Kline* is binding on the Court and there is no reason for the Court to find that § 782.7 is arbitrary and capricious, even if *Kline* and § 782.7 did not exist, the Defendants could not rely on the Motor Carrier Act exemption in any event.

Finally, the Department of Labor regulations concerning the exemptions, as outlined above, are entitled to *Chevron* deference in this case. Where "'the statute is silent or ambiguous with respect to the specific issue,' and an administrative agency has interpreted the statute, a reviewing court is bound by *Chevron* deference." *Cadet v. Bulger,* 377 F.3d 1173, 1185 (11th Cir. 2004) (quoting *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984)). Further, where a statute such as the FLSA "grants the

Secretary of Labor the authority to issue rules and regulations to implement the statute . . . [the courts will] defer to these regulations, as the agency interpretation is reasonable and not manifestly contrary to Congressional intent." *Polkey v. Transtecs Corp.*, 404 F.3d 1264, 1269 (11th Cir. 2005) (citing *Chevron*, 467 U.S. at 842-45).

### D. The Opinions of Judges Seitz, Ungaro-Benages, and Hoeveler in the *Carey International, Inc.* and *Corporate Connection Lines, Inc.* Cases Respectively

Initially, the Court should note that the plain meaning argument set forth above in § III.A., was not advanced in the cases before Judges Ungaro-Benages and Hoeveler, because *Packard* had not yet been decided. Judge Seitz did not rule on its applicability, because she found that regardless of that argument, the "Defendants prearranged travel arrangements with customers and destination management companies do not subject them to the jurisdiction of the secretary as a matter of law." (*Seitz Opinion* at 10).

Judge Hoeveler's order in *Corporate Connection Lines, Inc.* could not be clearer: "the Motor Carrier Act does not apply to limousine drivers in South Florida". (*Hoeveler Opinion* at 1). Judge Hoeveler based his holding on the regulations promulgated by the Department of Labor, 29 C.F.R. § 782.7 (2000), which state that "[e]ngagement in local transportation which is entirely intrastate commerce provides no basis for exempting a motor carrier employee." A binding former Fifth Circuit case has adopted § 782.7 and Judge Hoeveler noted that it specifically held that "[e]ven if the goods or people originated outside the state, if the motor carrier does not drive their vehicles across state lines, then they are not involved in interstate commerce" and thus the Motor Carrier Act exemption is not applicable. *Kline v. Wirtz*, 373 F.2d 281, 282 (5th Cir. 1967). Judge Hoeveler relied on *Kline* and § 782.7 in his ruling. (*See* p. 4 of Order). Judge Hoeveler relied on *Kline*, and noted if *Kline* did not apply, the defendants in those cases could not rely on the "through ticket" or "common arrangement" exception to the general rule that the Motor Carrier Act does not apply to employees who drive intrastate.

### F. The Department of Labor Investigated the Defendants Earlier This Year, and Determined that the Motor Carrier Exemption Did Not Apply

The Department of Labor has recently and specifically found that the Defendants are not entitled to invoke the Motor Carrier Act exemption with respect to the drivers. (Facts ¶¶ 4-5). The Department of Labor's findings and opinions are entitled to deference, as set forth above. Moreover, this opinion is admissible evidence. The Supreme Court of the United States has held that pursuant to Rule 803(8)(c), investigatory reports issued by government agencies, law enforcement, administrative bodies, or other "public" entities are to be considered generally admissible in federal trials. *Beech Aircraft Corp., v. Rainey, et al.,* 488 U.S. 153, 162 (1988). In *Beech Aircraft*, the Court ruled that under the Rule, not only are a report's listed facts admissible, but "factually-based conclusions or opinions" are also admissible. *Id.* "Rather than requiring that we draw some inevitably arbitrary line between the various shades of fact/opinion

that invariably will be present in investigatory reports, we believe the Rule instructs us -- as its plain language states -- to admit 'reports . . . setting forth . . . factual findings.'" *Id.* at 169.

This Court can also look to *Smith v. Universal Services, Inc.,* 454 F.2d 154 (5th Cir. 1972), which held that Equal Employment Opportunity Commission reports are admissible. The court noted, "the district court is obligated to hear evidence of whatever nature which tends to throw factual light on the controversy and ease its fact-finding burden. . . . [T]o ignore the manpower and resources expended on the EEOC investigation and the expertise acquired by its field investigators . . . would be wasteful and unnecessary." *Smith,* 454 F.2d at 157. *See also Green v. Louisiana Casino Cruises, Inc.,* 294 F. Supp. 2d 870 (M.D. La. 2003) (holding that a DOL report based on and containing findings of fact was admissible at trial).

Additionally, Investigator Chalumeau's report, which consists almost entirely of detailed factual findings, is admissible in its entirety because "portions of investigatory reports otherwise admissible under Rule 803(8)(c) are not inadmissible merely because they state a conclusion or opinion. As long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report." *Id.* at 170. Defendant Jedwab admitted that the Department of Labor found that Zappaterra, a limousine driver, was a non-exempt employee and was owed his overtime, and that her company paid the overtime. (Facts ¶¶ 4-5). Moreover, the Department of Labor's Field Operations Handbook, which cites to the above-stated regulations, specifically holds that local limousine drivers are not exempt under the Motor Carrier Act exemption, and Defendant Jedwab agreed with that that is so. (Facts ¶ 5). Summary judgment is easily warranted here, given the evidence in this case regarding this exemption.

### III. ANGULO IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE AS TO WHETHER THE TAXICAB EXEMPTION IS APPLICABLE

#### A. The Plain Meaning of FLSA, Particularly When Coupled with the Rubric that Exemptions Are to Be Narrowly Construed, Requires the Conclusion that Angulo Is Not "a Driver Employed by an Employer Engaged in the Business of Operating Taxicabs"

Title 29 U.S.C. § 213(b)(17) states that an overtime exemption applies to "any driver employed by an employer engaged in the business of operating taxicabs." The questions raised by the Defendants' affirmative defense at issue are the following: 1) is the corporate Defendant "engaged in the business of operating taxicabs" (when its owner and management employees admit that it is not, it does not own or operate any taxicabs, and it is not licensed to provide taxicab transportation) and 2) can Angulo be found to be an employee of such a business (when he did not drive a taxicab for the Defendants, only limousines) and thus exempt from overtime. The only way to answer the first question in the affirmative is to liberally construe the exemption to include "limousines" in the definition of "taxicabs". That would run afoul of two rubrics of statutory construction, the first being that exemptions under the FLSA are to be narrowly construed

against the employer, and the second being that statutes are to be given their plain meaning when they are being interpreted. Congress clearly meant to exempt the taxicab industry, and not the limousine industry from the FLSA.

Further, the courts have previously rejected the Defendants' argument. *Powell, et. al. v. Carey Int'l, Inc., et. al.* at 15-16, Case No. 05-21395-CIV-SEITZ (Mar. 17, 2006) (holding that three of indicia of limousine companies are 1) whether they charge a flat rate or hourly rate as opposed to a metered rate; 2) how they advertise themselves in the community; and 3) whether the drivers can cruise for passengers as opposed to pre-arranging all of the travel; in this case the Defendants charge a flat or hourly rate and not a metered rate (*Second Aff. of Angulo* ¶¶ 5-7, they advertise as a limousine company (Facts ¶ 11), and their drivers cannot cruise for passengers (*Second Aff. of Angulo* ¶ 5); (Facts ¶ 13); *Wirtz v. Cincinnati, Newport & Covington Transp. Co.*, 375 F.2d 513 (6th Cir. 1967) (rejecting argument that drivers driving for a limousine service providing transportation in four-passenger sedans called "red tops" were exempt under the taxicab exemption); *Airlines Transp. v. Tobin*, 198 F.2d 249 (4th Cir. 1952) (rejecting argument that drivers driving for a limousine service were exempt under the taxicab exemption); *Herman v. Brewah Cab, Inc.*, 992 F. Supp. 1054 (E.D. Wis. 1998) (rejecting argument that drivers driving elderly and disabled passengers in ambulette service are exempt under taxicab exemption, and noting that the defendant vehicles were unmetered, did not have vacancy signs, and were not advertised as taxicabs); *Mascol v. E & L Transp., Inc.*, 2005 WL 1123936 (E.D. N.Y. 2005) (rejecting argument that drivers driving elderly and disabled passengers in ambulette service are exempt under taxicab exemption). There is also a DOL opinion letter on point which holds that only taxicabs and taxi drivers can be exempt under the taxicab exemption (and not drivers of other business such as limousines, ambulettes for the disabled, etc.), because the term taxicab should be given its ordinary meaning. *See Opinion Letter, Wage and Hour Division of the U.S. DOL*, 1998 WL 852774, at *1 (Apr. 17, 1998) (reasoning that the principle that exemptions are narrowly construed prohibits the conclusion that drivers from taxicab driving companies can fit within the taxicab exemption). The DOL letter states, in pertinent part, as follows:

> While your client's vehicles might be involved in a number of activities associated with taxicab operations . . . overall, your client's vehicles do not service the same transportation needs as taxicabs. The ordinary meaning of that term contemplates vehicles that are offered for hire to the general public on the city streets.

*Id.* (citing *Pioneer Inv. Servs. v. Brunswick Assocs.*, 507 U.S. 380 (1993) (for the proposition that words in statutes are to be interpreted by being given their plain and ordinary meaning)). The Court should also realize that a DOL opinion letter is "entitled to respect" to the extent it is persuasive. *Christensen v. Harris County*, 529 U.S. 576 (2000). Accordingly, the only answer to the first question is no.

Concerning the second question, it would make no sense to construe an exemption that applies to taxicab drivers as including a limousine driver. It would run afoul of both of the above-mentioned rubrics of

13

statutory construction, as well as the Department of Labor's interpretation of the § 213(b)(17), which is that the taxicab exemption *does not apply to limousine drivers who drive for taxicab companies.* (Facts ¶ 8). Accordingly, the answer to the second question is no.

In interpreting a statute, the courts should begin "with the language of the statute itself." *United States v. Ron Pair Enterprises*, 489 U.S. 235, 241 (1989). "[T]he plain meaning of the statute controls unless the language is ambiguous or leads to absurd results." *United States v. McLymont*, 45 F.3d 400, 401 (11th Cir. 1995). And, as the Supreme Court has recently reminded, the best evidence of a statute's meaning is the text itself. *Geier v. American Honda Motor Co.*, 120 S. Ct. 1913, 1932 (2000). With respect to the scope of the taxicab exemption in the FLSA, "the intent of Congress is clear, [and] that is the end of the matter." *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842 (1984).

Title 29 U.S.C. § 213(b)(17) states that an overtime exemption applies to "any driver employed by an employer engaged in the business of operating taxicabs." To apply this exemption to a company whose owner and management personnel admit is not engaged in the business of operating taxicabs is ludicrous. (Facts ¶¶ 13, 15). Even if the corporate Defendant was in the business of operating taxicabs (which it is admittedly not), Angulo is still not exempt, because according to the plain statement of the Field Operations Handbook, Angulo was "[p]erforming work, including driving . . .such as operation of an airport limousine service." (*Department of Labor's Field Operations Handbook* § 24h03). Section 24h03(4) makes an internal cross-reference to § 24c04 of the FOH, which references limousine drivers in general. It is clear from this that the Department of Labor believes that limousine drivers are not included as "taxicab" drivers for purposes of the taxicab exemption, and Defendant Jedwab admitted this in her deposition as the Rule 30(b)(6) corporate representative with the most knowledge of the Motor Carrier Act and Taxicab exemptions. (Facts ¶ 14).

The Defendants may argue that the case *Cariani v. D.L.C. Limousine Serv. Inc.*, 363 F. Supp. 2d 637 (S.D. N.Y. 2005) requires a different result, but any such argument is misplaced. The local regulations defining what a taxicab is in New York differ significantly from those in South Florida. For example, Section 22½-1(k)(1) of the Miami-Dade County Code defines a taxicab as follows:

> Taxicab means a motor vehicle that employs the use of a taximeter, as defined in Section 22½-1(p) of this Chapter, or a motor vehicle not more than eight (8) passengers, exclusive of the driver, operated for compensation at rates, prescribed by Commission resolution, recorded and indicated by a taximeter in operation when the vehicle is in use for transportation of any passenger, and where the route or destination is controlled by the passenger.

(Facts ¶ 19). While section 22½-1(k)(2) of the Miami-Dade County Code defines a limousine very differently, as follows:

> Limousine means any chauffeur driven motor vehicle that is engaged for the exclusive use of the passenger, not equipped with a taximeter, which provides seating accommodations for

> not more than nineteen (19) passengers, exclusive of the driver, and where pickup is on a
> prearranged basis and the route or destination is controlled by the passenger.

(Facts ¶ 20). In this case, applying the South Florida regulations, the drivers in this case were clearly not taxicab drivers because none of the Defendants' vehicles have taximeters in them (Facts ¶ 21), and the bulk (80%) of the Defendants' work comes from destination management companies bringing large groups of convention attendees to Florida for prearranged travel. (Facts ¶ 21). However, before even looking at the local regulations, the fact is that there are very basic differences between taxicabs and limousines, as recognized by the Defendants' own management officials. (Facts ¶ 11).

Moreover, the company sued in *Cariani v. D.L.C. Limousine Serv. Inc.*, 363 F. Supp. 2d 637, is vastly different than the corporate Defendant in this case which utilizes as many stretch limousines, minibuses, and vans, as it does sedans (Facts ¶ 22), the limousines which hold 8 or more passengers, unlike the defendant in *Cariani* which was largely a sedan business. For example, Mr. Madrid testified that a 10-passenger limousine was the primary means of transportation for him. Angulo largely drove a minivan. (*Second Aff. Angulo* ¶¶ 5-6).

Most significantly, the *Cariani* court draws attention to the Field Operations Handbook's definition of who a taxicab driver is, but fails to note that on *precisely the same page* on which the broad definition of "Business of operating taxicabs" is given, the Handbook gives "Examples of nonexempt work," including "(4) Performing work, including driving, in connection with other business operations of the employer … such as operation of an airport limousine service." (*Department of Labor Field Operations Handbook*, § 24h03). The fact that "business operations" "such as operation of an airport limousine service" are specifically *not* included in the definition of "Business of operating taxicabs" precludes reading the operation of an airport limousine service as falling within the rubric of taxicab operation. The Department of Labor also provides clear definitions of both "taxi driver" and "chauffeur" in its Occupational Outlook Handbook, noting in particular that "Chauffeur service differs from taxi service in that *all* trips are prearranged" (emphasis added). These Department of Labor documents define the terms that are exactly at issue here: *all* of the Plaintiffs' trips were prearranged for them by Defendants. (Facts ¶¶ 11, 21). The Department of Labor clearly did not mean for the taxi cab exemption to apply to airport limousine service chauffeurs like the Plaintiffs here. Moreover, the Department of Labor's Field Operations Handbook specifically states that the taxicab exemption contained in 29 U.S.C. § 213(b)(17) (the taxicab exemption relied on by the Defendants) specifically excludes "limousine service" drivers from the exemption, as follows:

> 24h03   Examples of nonexempt work. (a) Examples of nonexempt work by "any
> driver" for purposes of Sec. 13(b)(17) are:

*   *   *

(4) Performing work, including driving, in connection with other business operations of the employer (i.e., not his taxicab operations), such as operation of an airport limousine service (see FOH 24c04), a pick-up delivery service, or a moving and storage service.

(*Department of Labor's Field Operations Handbook* § 24h at 24h03). The Department's use of the term "business operations" means that the Department clearly believes that that term is separate and distinct from the term "taxicab business".

Finally, the Department of Labor regulations concerning the exemptions, as outlined above, are entitled to *Chevron* deference in this case. *Cadet v. Bulger*, 377 F. Supp. 1173, 1185 (11th Cir. 2004) (quoting *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)). Further, where a statute such as the FLSA "grants the Secretary of Labor the authority to issue rules and regulations to implement the statute . . . [the appellate court will] defer to these regulations, as the agency interpretation is reasonable and not manifestly contrary to Congressional intent." *Polkey v. Transtecs Corp.*, 404 F.3d 1264, 1269 (11th Cir. 2005) (citing *Chevron* at 842-45). As shown, the regulations promulgated by the DOL and the DOL's own Field Operations Handbook definition of airport limousine chauffeurs as examples of *non*exempt drivers make clear that Plaintiffs in this case are not exempt from the FLSA's overtime provision.

## B.   The Department of Labor Investigated the Defendants Earlier This Year, and Determined that the Taxicab Exemption Did Not Apply

The Department of Labor has recently and specifically found that the Defendants are not entitled to invoke the taxicab exemption with respect to the drivers. (Facts ¶ 17). The Department of Labor's findings and opinions are entitled to deference, as set forth above. Moreover, this opinion is admissible evidence. The Supreme Court of the United States has held that pursuant to Rule 803(8)(c), investigatory reports issued by government agencies, law enforcement, administrative bodies, or other "public" entities are to be considered generally admissible in federal trials, as set forth above. *Beech Aircraft Corp., v. Rainey, et al.*, 488 U.S. 153, 162 (1988).

Additionally, Investigator Chalumeau's report, which consists almost entirely of detailed factual findings, is admissible in its entirety because "portions of investigatory reports otherwise admissible under Rule 803(8)(c) are not inadmissible merely because they state a conclusion or opinion. As long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report." *Id.* at 170. The Court should not disregard the Department of Labor's specific findings with respect to this company. How on earth could the Court find that the drivers are exempt when they never drove a taxi for the Defendants (Facts ¶ 8), the Defendant is not licensed to provide taxi service (Facts ¶ 9), the Defendant does not advertise taxi service (Facts ¶ 10), and when the Defendants do not own or operate any taxicabs? (Facts ¶¶ 13-14). Summary judgment is easily warranted here, given the evidence in this case regarding this exemption.

**IV.**  **ANGULO IS ENTITLED TO SUMMARY JUDGMENT ON THE § 207(i) EXEMPTION**

Section 207(i) of the FLSA provides for an exemption to the extent that a service worker was paid commissions, and that those commissions require the conclusion that the worker earned at least one and one-half times the minimum wage ($7.73/hr), if the employer has proof (in the form of one-month's worth of documentation for a minimum representative period) that the worker earned $7.73/hr. The Defendants cannot prove this exemption here because: 1) the drivers were not paid commissions (but rather a percentage of trip plus a gratuity (*Second Angulo Aff.* ¶ 2)); 2) the Defendants' own lawyer admitted that the Defendants' position is that the drivers were paid a piece rate, and the Eleventh Circuit has specifically held that a piece rate is not a commission, and 3) the Defendants did not keep time records, and therefore cannot prove that they have records for a representative period that prove Angulo earned at least $7.73/hr.

In addition to Angulo's Affidavit (which averred that he was paid a percentage of the trip plus a gratuity), defense counsel admitted that Angulo was paid a piece rate. (*Dep. of Zappaterra* at 128-30) (stating that "it's our position that the plaintiff [and the calls members] were paid a piece rate for the work that they performed for Key Transportation. We can say that for sure.") (attached hereto as Exhibit 2). The Eleventh Circuit has held that "piecework pay is not a commission." *Klinedinst v. Swift Investments, Inc.*, 260 F.3d 1251, 1258 (11th Cir. 2001). Accordingly, Angulo was not paid a commission.

In this case, no documents have been given to Angulo that constitute the representative period that Angulo was paid at least $7.73/hr for at least one month, as required by § 207(i). In fact, it is clear that Defendants violated the FLSA's recordkeeping requirements, because they have admitted not keeping records, and the DOL so found; thus, a § 207(i) exemption is inapplicable. (Facts ¶¶ 30-34). Gustavo Madrid testified that Defendants do not keep records of work. (*Dep. of Madrid* at 210-11, attached Ex.3).

**V.**  **ANGULO IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE AS TO WHETHER HE WORKED OVERTIME**

The Eleventh Circuit Pattern Jury Instructions state as follows concerning a FLSA case:

> This case arises, in part, under the Fair Labor Standards Act, the federal law that provides (in this situation) for the payment of an additional half-time pay required by law. The Plaintiff claims that the Defendants did not pay the overtime pay required by law.
>
> In order to prevail on this claim, the Plaintiff must prove each of the following facts by a preponderance of the evidence:
>
> *First:*    That the Plaintiff was employed by the Defendants;

17

> *Second:*      That the Plaintiff was engaged in commerce to the extent to that his work was so closely related to the movement of commerce that it may be deemed a part of it, rather than merely an isolated local activity; and

> *Third:*  That the Defendants failed to pay the Plaintiff the overtime required by law.

*Pattern Jury Instructions for the Eleventh Circuit*, § 1.7.1, p. 127-29 (2000 ed.). Angulo moves for summary judgment as to the third element, as he worked overtime for the Defendants. (*Second Aff. of Angulo* ¶ 2, 9).

## VI.   THE DRIVERS ARE ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE AS TO WHETHER THE DRIVERS WERE EMPLOYEES

In different contexts, courts have developed separate tests to analyze whether an individual's status is that of either an employee or an independent contractor. It is settled that under the FLSA, the "economic realities" test is used. *Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297 (5th Cir. 1975); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992). The economic realities test applies to FLSA cases, because the FLSA "defines the verb "employ" expansively to mean 'suffer or permit to work.'" *Darden*, 503 U.S. at 318 (quoting 29 U.S.C. § 203(g)). In applying the economic realities test, an "employee" is an individual "who as a matter of economic reality [is] dependent upon the business to which [she] render[s] service." *Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 299 (5th Cir. 1975); 29 C.F.R. § 1620.8. This is an extremely broad test, the application of which will typically result in a finding that the plaintiff is an "employee". *See Mednick*, 508 F.2d at 299-300.

In applying this test, courts have held that limousine drivers are not independent contractors under the FLSA, but rather are "employees". *See, e.g., Gustafson v. Bell Atlantic Corp.*, 171 F. Supp. 2d 311, 324 (S.D. N.Y. 2001). In *Gustafson*, the court held that the chauffeur was economically dependent upon the defendant, because without it, he could not render services. *Id.* In this case, in much the same way as the limousine driver in *Gustafson* was dependent upon the company to earn a living, so too was Angulo here. Angulo, as a matter of economic reality, was completely dependent upon the Defendants' business in order to render his chauffeur services. (Facts ¶¶ 24-29). Carulla testified that as a matter of economic reality, the drivers are dependent upon the Defendants to earn a living, as follows:

> Q:   So that being the case, if a driver is exclusively working for Key and if that driver is, you would agree with me, that the driver is really dependent upon being assigned transfers by Key to make a living, wouldn't you agree?

> A:   Yes. [objection omitted]

> Q:   If a driver is only working for Key and if the driver's income is determined by the quality and quantity of the transfers that Key assigns the drivers, wouldn't you agree that the driver is economically dependent upon Key for his or her livelihood? [objection omitted]

18

A:    Yes.

(Facts ¶ 26).    Also, Angulo was required to sign an application for employment, which should be enough in and of itself to require summary judgment.  (Facts ¶ 24).

The Department of Labor investigative report discussed seven (7) factors that can be used to determine whether an individual is an employee or independent contractor.  (Facts ¶ 28).  The seven factors should not have to be resorted to when the court and the parties can ascertain whether from the whole of the circumstances the plaintiff is economically dependent upon the putative employer for his or her livelihood. *Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 300 (5th Cir. 1975) (holding that the parties disputing employee status should not allow any factors "to overweigh the actual operation [workplace totality], the 'economic reality" of the situation"); *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976) (holding that the five factors "are aids—tools to be used to gauge the degree of dependence of alleged employees on the business with which they are connected.  It is dependence that indicates employee status").

The *Mednick* court held that the parties should not focus on the factors, but rather should simply ask whether the plaintiff was simply "dependent upon finding employment in the business of others", *Mednick*, 508 F.2d at 301, as follows:

> Both parties have selected *Rutherford* and *Silk* factors, showing their presence or absence in subsequent cases with results favorable to their own, arguing that therefore such selected factors should control the disposition of the present case.
>
> These arguments give too little weight to the ultimate criteria pointed out above. Additionally, the court below and the parties placed too great a reliance on the bare legal powers which each of the parties had under their informal working agreement.  The result was to permit potential powers of little or no effective significance in the actual operation of the working arrangement to overweigh the actual operation, the 'economic reality' of the situation.  Under the Supreme Court's opinion in *Goldberg v. Whitaker House Coop.*, 366 U.S. 28 (1961), this was error.
>
> Considered in isolation, the *Rutherford* and *Silk* criteria produce no clear cut conclusion in this case.
>
> *    *    *
>
> But when we consider the precisely targeted criteria in the light of the ultimate inquiries that are drawn from the purposes of the Act itself, the answer becomes clear.  Is Mednick the kind of person meant to be protected by the F.L.S.A.?  Is he dependent upon finding employment in the business of others . . . [The court answered the question in the affirmative, and found that the plaintiff was an employee.]

*Mednick*, 508 F.2d at 301; *see also Cowan v. Treetop Enterprises, Inc.*, 120 F. Supp. 2d 672 (M.D. Tenn. 1999) (holding that for purposes of the FLSA, employer-employee relationship is based upon the 'economic reality' test, considering all of the circumstances of the employment relationship rather than "technical

concepts" or technical application of any factors); *Nash v. Resources, Inc.*, 982 F. Supp. 1427 (D. Or. 1997) (failure of the employee to fulfill the factors is not fatal to his or her ability to show he or she is an employee); *Shultz v. Jim Walter Corp.*, 314 F. Supp. 454 (M.D. Ala. 1970) (determining employee status under the FLSA depends upon the circumstances of the whole activity). In this instance, the factors should be unnecessary, because of the application of employment, and because of Carulla's testimony.

However, if the Court desires to apply the factors, those factors weigh heavily in favor of Angulo; in fact every single factor does. (Facts ¶ 28).

## VII.  THE DEFENDANTS ADMITTEDLY VIOLATED THE RECORDKEEPING REQUIREMENTS OF THE FAIR LABOR STANDARDS ACT

The Fair Labor Standards Act requires that employers keep records of the hours that their employees work. 29 U.S.C. § 211(c); 29 C.F.R. § 516.1 & .2. In this case, it is clear that the Defendants violated the FLSA's recordkeeping requirements, because they have admitted as much. (Facts ¶¶ 30-34). Moreover, the Department of Labor specifically found that they violated those provisions with respect to Zappaterra, and the records kept concerning him were the same as the records kept for the other drivers. (Facts ¶ 31).Accordingly, the Court should grant summary judgment in Angulo's favor as to this issue.

## CONCLUSION

For the foregoing reasons, the drivers are entitled to summary judgment as to the issue of whether the drivers are exempt under the Motor Carrier Act, the taxicab exemption, whether Angulo worked overtime, whether he was an employee, and whether the Defendants violated the FLSA's recordkeeping requirements.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been duly furnished by United States mail to:  Susan H. Aprill, Esq., Conrad & Scherer, LLP, 633 S. Federal Highway, P.O. Box 14723, Fort Lauderdale, Florida 33302, this 30th day of May, 2006.

Glasser, Boreth, Ceasar & Kleppin
Attorneys for Plaintiff
8751 W. Broward Blvd.
Suite 105
Plantation, FL 33324
Tel. (954) 424-1933
Fax (954) 474-7405
E-mail: Glabor@aol.com

By_____
Chris Kleppin
Fla. Bar No. 625485

# EXHIBIT 1

Chapter 24

TRANSPORTATION EXEMPTIONS

24a    MOTOR CARRIER EXEMPTION - SEC 13(b)(1)

24a00  General provisions of FLSA Sec 13(b)(1) and IB 782

  (a)  FLSA Sec 13(b)(1) provides that FLSA Sec 7 shall not apply to any
       employee for whom the Department of Transportation's Federal Highway
       Administration (DOT/FHWA) has power to establish qualifications and
       maximum hours of service pursuant to the provisions of Sec 204 of the
       Motor Carrier Act of 1935.

  (b)  IB 782, together with the instructions contained in this chapter, form
       the official WH position with respect to the application of Sec 13(b)(1).

24a01  Leasing and renting of motor vehicles

  (a)  Generally, the Sec 13(b)(1) exemption is limited to employees of motor
       carriers (see IB 782.2).  However, the Motor Carrier Act gives the DOT
       power to establish qualifications and maximum hours of service for
       drivers employed by non-carriers in situations where the non-carrier
       leases or rents motor vehicles with such drivers to motor carriers.
       Thus, where all other tests for exemption are met, Sec 13(b)(1) is
       applicable to these drivers while they are driving the motor vehicles
       leased or rented to motor carriers, on the same basis as if they were
       actually employed by the carriers.

  (b)  Except as provided in (a) above, Sec 13(b)(1) does not extend to other
       safety-affecting employees of the leasing or renting establishment,
       such as mechanics, unless the employer is a motor carrier in his own
       right.  For example, the employer may conduct his operations in such a
       manner as to be a private carrier, or he may lease or rent motor
       vehicles to a shipper under such conditions that he maintains control
       and direction over the carrier services performed in which case he would
       be a contract carrier.

24a02  Effect of ownership of motor vehicles upon status as a motor carrier

       A company may be a motor carrier for the purposes of the Motor Carrier
       Act whether it owns, rents, or leases the motor vehicles it uses.

24a03  FLSA Sec 13(b)(1) not applicable under PCA

       While certain employees may be exempt under Sec 13(b)(1) from the OT
       pay requirements of the FLSA, the daily and weekly OT pay provisions of
       the PCA are applicable to these employees if they are subject to the
       PCA.  Likewise, the exemption contained in FLSA Sec 13(b)(1) has no
       relationship to PCA Sec 9 which provides a specific exemption under the
       PCA for the carriage of freight or personnel by bus or truck where
       published tariff rates are in effect.

24a04  <u>Motor carriers of migrant workers</u>

While DOT/FHWA has authority to establish certain regulations with
respect to carriers of "migrant workers", the Motor Carrier Act
specifically provides that the exemption under FLSA Sec 13(b)(1) shall
not extend to such carriers solely by virtue of such transportation.  A
migrant worker is defined in that law as any individual proceeding to or
returning from employment in agriculture as defined in FLSA Sec 3(f).

24a05  <u>DOT jurisdiction over private carriers limited to carriage of property</u>

(a)  Sec 203(a)(17) of the Motor Carrier Act defines the term "private carrier
of property by motor vehicle" to mean "any person not included in the
terms 'common carrier by motor vehicle' or 'contract carrier by motor
vehicle', who or which transports in interstate or foreign commerce by
motor vehicle property of which such person is the owner, lessee, or
bailee, when such transportation is for the purpose of sale, lease, rent,
or bailment, or in furtherance of any commercial enterprise".

(b)  It should be noted that the DOT jurisdiction over private carriers is
limited to private carriers of "property".  If the transportation of
persons is the primary purpose of a trip in interstate commerce by a
private carrier and any incidental transportation of property is not
significant as a reason for the trip, the transportation involved would
not be within the jurisdiction of the DOT.  An employee would not be
considered as engaged in transporting property for purposes of the Motor
Carrier Act because of an arrangement to drive by the post office on his way
to or from work to pick up or deliver his employer's interstate mail or
packages, whether bulky or not.

(c)  If the transportation of property, regardless of its bulk or weight, is
the primary purpose of an interstate trip by a private carrier, or if the
transportation of such property is a distinct and definite reason for
the trip along with the transportation of persons, the transportation is
within the jurisdiction of the DOT.  This principle would apply, for
example, where property such as an automobile or a truck is driven to
another State not simply as a means of transportation for the driver or
passengers but because the movement of the vehicle itself is a distinct
purpose of the trip.  Likewise, this principle applies where self-propelled
machines such as bulldozers and cranes are driven over the public highways
as part of a journey in which such vehicles are moved from one State to
another.

(d)  The fact that an employee of a private carrier may use his own vehicle
in transporting property in interstate commerce does not deny an otherwise
applicable exemption.

24a06  <u>Freight forwarders who are not carriers</u>

The FLSA Sec 13(b)(1) exemption does not apply to the loading and
checking employees of an interstate freight forwarder who does not

# EXHIBIT 2

**Page 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-20233-HUCK/SIMONTON

ABE ANGULO, and all others
similarly situated,

    Plaintiff,

vs.

KEY TRANSPORTATION SERVICE, CORP.,
a Florida corporation, and ORLIE JEDWAB,
an Individual,

    Defendants.

_____/

8751 West Broward Boulevard
Suite 105
Fort Lauderdale, Florida
Wednesday, 9:30 a.m.
May 10, 2006

D E P O S I T I O N
of
ANDREA ZAPPATERRA
taken on behalf of the Plaintiff
pursuant to notice of taking deposition.

- - -

**Page 2**

APPEARANCES:
    GLASSER, BORETH, CEASAR & KLEPPIN, P.A., by
    Chris Kleppin, Esq., of counsel,
    8751 West Broward Boulevard, Suite 105
    Plantation, Florida 33324
    Attorney for Plaintiff.

    CONRAD & SCHERER, LLP, by
    Susan Aprill, Esq., of counsel,
    633 South Federal Highway
    Fort Lauderdale, Florida 33302
    Attorney for Defendant.

    JACKSON LEWIS, LLP, by
    Patrick G. DeBlasio, III, Esq. of counsel,
    One Biscayne Tower, Suite 3500
    Two South Biscayne Boulevard
    Miami, Florida 33131

I N D E X
WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
ANDREA ZAPPATERRA
(By Mr. Kleppin) 7

EXHIBITS
Plaintiff's          Page No.
1                    76
2                    151
3                    163
4                    196
5                    200

**Page 3**

1 Thereupon:
2     ANDREA ZAPPATERRA
3 was called as a witness and, having been duly sworn,
4 was, examined and testified as follows:
5     MR. KLEPPIN: I just want to make an
6 opening statement for the record, and that is
7 that I do not as of this time have the
8 defendants' answer to the First Amended
9 Complaint although that was filed on or about
10 April 10, 2006, and that Ms. Aprill has
11 informed me that when that answer is provided
12 to me that the defendants' defenses are
13 essentially going to be the same defenses that
14 were used in the George Rossi case with the
15 exception of that I believe that the taxicab
16 exemption has not been —
17     MS. APRILL: Does he need to hear this
18 because I don't want to influence his
19 testimony?
20     MR. KLEPPIN: I just want to have the
21 statement on the record as to what the
22 defenses are so if there's a problem later.
23     Yes, the witness can be excused from the
24 room, sure, while we do this. I have no
25 problem with that.

**Page 4**

1     Can we have him just stand out in the hall
2 for two minutes?
3     MS. APRILL: Yes. Would you do that?
4     THE WITNESS: No, I don't mind.
5     (Thereupon, the witness was excused from
6 the proceedings.)
7     MS. APRILL: I doubt that it would
8 matter, but —
9     MR. KLEPPIN: Well, that's okay.
10     And that is that, my understanding is that
11 as to Abe Angulo, the defendants are not going
12 to be asserting the taxicab exemption, but
13 that if the optima motion is granted against
14 those four optimum that are currently pending
15 the defendant may assert the taxicab exemption
16 with respect to some or all of them, and that
17 the defendant is not going to assert the
18 independent contractor defense against any of
19 these people; is that correct?
20     MS. APRILL: The ones that are identified
21 so far, yes.
22     MR. KLEPPIN: Okay.
23     MS. APRILL: If you come up with someone
24 else, I don't know.
25     MR. KLEPPIN: All right. Okay. I just

Page 125

1    MS. APRILL:  I don't know what they found
2    anymore than what these papers say, nor does
3    he.
4        My point is that it's in the papers, and
5    you're arguing what you're arguing, and that's
6    your right, but --
7    MR. KLEPPIN:  Well, with him it's
8    different because before with all these other
9    witnesses.
10       And how about with response to the summary
11   judgment?
12       You said, well, the Court, you can't
13   conclude from the Department of Labor this
14   sheet here that he has attached, these
15   documents, that this one driver that they have
16   the recordkeeping violation for, the
17   person where there's a recordkeeping violation
18   for is a driver, number one.
19   MS. APRILL:  You're allowed to ask him
20   all that.
21   MR. KLEPPIN:  You've even disputed that
22   Andrea Zappaterra is a driver.  I didn't know
23   that until just know.  It's always been in
24   this case, all these other witnesses that have
25   paraded in here and said he's not a driver.

Page 126

1    He does paperwork, and all this --
2    MS. APRILL:  He does both he's testified.
3    We're not arguing about that.
4    MR. KLEPPIN:  I said, sir, how would you
5    describe it, what you did for a living?
6        He said I was a driver.  I was primarily a
7    driver.
8        Yes, I know he does paperwork, too.
9    MS. APRILL:  Chris, you can ask him that.
10   I'm talking about the reading --
11   MR. KLEPPIN:  I feel --
12   MS. APRILL:  -- of the words.
13   MR. KLEPPIN:  I feel that I have to go
14   through all of this and establish from the
15   beginning that the person for the
16   recordkeeping violation in this set of
17   documents from the Department of Labor is
18   Mr. Zappaterra.
19       I get the feeling you're disputing that.
20   And I have to establish he's a driver.
21   MS. APRILL:  Chris, we're not disputing
22   that he drove, so I don't know where you got
23   that from.
24   MR. KLEPPIN:  Well, you're disputing that
25   his overtime has had anything to do with the

Page 127

1    fact that he was driving the vehicle for the
2    company.
3    MS. APRILL:  Well, I disagree with that.
4    MR. KLEPPIN:  If we can agree on this we
5    can sit down on my computer, we can draft a
6    set of requests for admissions.  Let's do it.
7    We'll all do it together so we can end these
8    issues.  And let's all move on.
9        I have a lot of other cases that I'd
10   rather be spending my time with.  I really
11   don't want to do a big deposition today in
12   this case.
13       If we can agree to this, let's sit down as
14   lawyers, and just what is at issue in this
15   case, and maybe we can formulate that.  Maybe
16   we can even go so far as to resolve it.
17       If we can't, let's at least narrow it
18   because so my fees aren't huge and her fees
19   aren't huge.
20       And if, you know, maybe I'm taking this
21   all too seriously, but it seems to me, I've
22   got to prove on this document everything about
23   Zappaterra with respect to it.  This is what I
24   was going to do in the prior case.  And let's
25   at the lunch break, let's think about it.

Page 128

1    MS. APRILL:  All right.
2    MR. KLEPPIN:  Maybe there's some requests
3    for admissions we can do to end this.  I'd
4    rather do it that way than -- It's awkward,
5    the three hours of questioning.  And the
6    witness seems to understand what's going on,
7    but he's kind of hesitant.
8    MS. APRILL:  How much time do you want to
9    spend?
10   MR. KLEPPIN:  An hour.
11   MS. APRILL:  Okay.
12   (Thereupon, a lunch recess was taken.)
13   MR. KLEPPIN:  The defendants have
14   clarified their position with respect to how
15   they believe the drivers were paid, and that
16   they believe, other than Mr. Zappaterra, who
17   has a salary thing that's different, that the
18   other drivers, specifically, the plaintiff in
19   this case, Mr. Angulo, it's their position
20   that he was paid a piece rate.
21       Is that --
22   MS. JEDWAB:  Stop.
23   MR. KLEPPIN:  Is that correct?
24   MS. APRILL:  What's wrong?
25   MS. JEDWAB:  Because I don't think that

Page 129

1  you said anything about Andrea Zappaterra
2  being different or not different. I didn't
3  hear anything with that stipulation.
4      MR. KLEPPIN:  Okay. Let's just say then
5  strictly for Mr. Angulo.
6      MS. JEDWAB:  No, you talked about a
7  particular thing in terms of piece rate,
8  period.
9      MR. KLEPPIN:  Right.
10     MS. JEDWAB:  How we paid. So why are you
11 saying one thing on one driver as opposed to
12 another?
13     I don't want you coming back and saying,
14 oh, you —
15     MR. KLEPPIN:  Well, because the man just
16 testified he gets paid a salary. He's a
17 unique person.
18     MS. JEDWAB:  That's not what was
19 stipulated here. You said ours is a piece
20 rate. And that's it. Piece rate, period.
21     MS. APRILL:  I think maybe the way to
22 resolve this is to say it's our position that
23 the plaintiff or the plaintiff group, if
24 there's these four or five gentlemen, were
25 paid a piece rate for the work that they

Page 130

1  performed for Key Transportation. We can say
2  that for sure.
3      MR. KLEPPIN:  Okay.
4      MS. APRILL:  I don't know if that —
5      MR. KLEPPIN:  That's fine. This covers
6  it. And the plaintiff disagrees, but that's
7  okay. I bet that helps me for further
8  questions.
9      Okay. So we'll bring Mr. Zappaterra back
10 in.
11 BY MR. KLEPPIN:
12     Q  Okay. Mr. Zappaterra, you have your glasses
13 now?
14     A  Yes.
15     Q  Can I have those other glasses back?
16     Oh, thank you. Thank you very much. I
17 appreciate that.
18     If you could take a look at D 00447. You
19 see where it says Section 7 Overtime kind of near the
20 top of that page on the left-hand margin?
21     A  This here (indicating).
22     Q  Okay. And under that, do you see where it
23 says, "Overtime violations occurred when employer
24 failed to pay 13 non-exempt dispatcher, driver and
25 customer service hourly employees time and one half

Page 131

1  for all hours worked in excess of forty and 1 limo
2  driver salaried employee the additional half time for
3  his hours over forty"?
4      Do you see that sentence?
5      A  Yes.
6      Q  Okay. Now we just went through the list of
7  all these 14 people, and you were the only limo
8  driver salaried employee, right?
9      A  Yes, I think. Yes.
10     Q  Okay. Could you look under the Computations
11 Section?
12     It's the next paragraph down.
13     A  I see it.
14     Q  It says, "Computations, the method the
15 computations was as follow: for the hourly
16 employees, multiply half of the employees' regular
17 rate of pay by the hours over forty for the
18 violations weeks and for the 2 years period of
19 investigation. For the salaried employee, this
20 investigation had to reconstruct using 42 hours,
21 since no records were available for inspection."
22     Do you see that?
23     A  I can see this, yes.
24     Q  Okay. Now, we know that you're the only
25 salaried employee because the other 13 people were

Page 132

1  hourly.
2      We read that in the previous paragraph,
3  remember?
4      A  I was salary?
5      Q  Yes, you were.
6      Remember that you were the salaried limo
7  driver?
8      A  I'm not on salary. I am on — What you call
9  it? Dispatch by percentage. Not on fixed salary.
10     Q  Okay. Well, you wish to change your
11 testimony from this morning?
12     This morning you had said you had the 350
13 salary floor, and then if you earned more than that
14 by the percentage of the trip, plus a gratuity, then
15 you might get more than 350 in pay a week, but you at
16 least had this minimum of 350 salary, remember?
17     A  Oh, that's what you mean. Okay.
18     Q  You remember that?
19     A  Yes, I remember that part. Yes.
20     Q  And remember you were saying there was some
21 weeks in the summer where you might not have driven
22 at all and would kind of do paperwork in the office,
23 and you would get your 350 salary, right?
24     A  Correct, yes.
25     Q  Okay. So do you see under Computations

EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  05-21001-CIV-GRAHAM/O'SULLIVAN

GEORGE ROSSI, and all others       )
similarly situated,                )
                                   )
            Plaintiff,             )
                                   )
vs.                                )
                                   )
KEY TRANSPORTATION SERVICE CORP.,  )
a Florida corporation, and ORLIE   )
JEDWAB, an individual,             )
                                   )
            Defendants.            )
                                   )
- - - - - - - - - - - - - - - - - -)

DEPOSITION OF GUSTAVO A. MADRID
VOLUME I  (Pages 1 - 198)
————— — ——— — ————

Tuesday, October 11, 2005
633 South Federal Highway - 8th Floor
Fort Lauderdale, Florida   33301
10:20 a.m. - 4:58 p.m.

APPEARANCES:
GLASSER, BORETH, CEASAR & KLEPPIN
BY:  CHRISTOPHER KLEPPIN, ESQUIRE
8751 West Broward Boulevard - Suite 105
Plantation, FL   33324
954/424-1933
Appearing on behalf of the Plaintiff

CONRAD & SCHERER, LLP
BY:  SUSAN H. APRILL, ESQUIRE
633 South Federal Highway - 8th Floor
Fort Lauderdale, FL   33302
954/462-5500
Appearing on behalf of the Defendants
ALSO PRESENT:  Marianne DeVries

Page 210

1   taxes as required by the federal government?
2        MS. APRILL: Objection.
3        A. Yes, I will.
4   BY MR. KLEPPIN:
5        Q. And do you know that that's one of the
6   things that Mr. Rossi is seeking to recover here, to
7   have Key Transportation be required to pay half the
8   Social Security and then of course he and any of the
9   class members would have to pay their half?
10       A. Yes.
11       Q. So you're prepared to pay your half, but
12  you don't want to pay the whole thing as Key has it
13  all set up now; is that true?
14       A. That's correct.
15       Q. Isn't it true that Key Transportation does
16  not have any time records with respect to the hours
17  that you worked?
18       MS. APRILL: Objection.
19       A. They don't have a record.
20  BY MR. KLEPPIN:
21       Q. And if they did have a record of the time
22  that you worked, wouldn't Key provide those, and
23  that way we could see then exactly the amount to the
24  minute that you worked for the company?
25       MS. APRILL: Objection.

Page 211

1        A. Yes. If they did, yeah.
2   BY MR. KLEPPIN:
3        Q. They would have produced those in a
4   minute; correct?
5        A. Yes.
6        MS. APRILL: Objection.
7   BY MR. KLEPPIN:
8        Q. Have you, in coming up with I think you
9   said that you believe that on average, with the
10  exception of July, August and September, that as
11  best you can figure it, you were working
12  approximately 84 hours?
13       A. Yes.
14       Q. And that's per week?
15       A. Eighty-four hours, yeah, per week.
16       Q. And there are some weeks you would have
17  worked a lot more than that and other weeks a lot
18  less?
19       MS. APRILL: Objection.
20       A. That's correct.
21  BY MR. KLEPPIN:
22       Q. How do you arrive at the 84 hours a week?
23       A. Well, I was calculating an average of 13
24  to 14 hours a day, I was working about six days to
25  six days and a half, it comes out to 84 hours.

Page 212

1        Q. Okay. Well, were there some weeks when
2   you worked seven days and other weeks you worked
3   less?
4        A. That's correct.
5        Q. Okay. So then if you worked at least some
6   weeks where, say, you only worked six days,
7   whatever, then you know that the average number of
8   weeks -- I mean average number of days that you
9   worked in a week couldn't be seven?
10       A. Yes.
11       Q. So that number has to be at least somewhat
12  less than seven?
13       A. Right.
14       Q. Because there's at least some weeks in
15  which you only worked, whether it be six days, five
16  days, whatever, there's at least some weeks you did
17  not work the full seven days?
18       A. Right. That's correct.
19       MS. APRILL: Objection.
20  BY MR. KLEPPIN:
21       Q. Now, did you say that on average
22  you think that, to the best you can remember it, you
23  were working 12 to 14 hours a day?
24       A. Yes.
25       MS. APRILL: Objection.

Page 213

1   BY MR. KLEPPIN:
2        Q. So the average of 12 to 14 would be 13
3   hours per day?
4        A. Yes.
5        MS. APRILL: Objection.
6   BY MR. KLEPPIN:
7        Q. Okay. Do you know whether or not 13
8   times, say, six and a half equals a little bit more
9   than 84?
10       MS. APRILL: Objection.
11       A. Yes.
12  BY MR. KLEPPIN:
13       Q. You had testified something that struck me
14  in your direct examination, that you really don't
15  know the actual birthdays of your children.
16       A. Yes.
17       Q. Why is it that you don't know their
18  birthdays?
19       A. Why? Because my memory is not too -- it's
20  not too good.
21       Q. Okay. Do you know if not being able to
22  remember their birthdays has anything to do with the
23  number of hours that you're working in the limousine
24  industry?
25       MS. APRILL: Objection.

54 (Pages 210 to 213)